NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3899-21

IN THE MATTER OF THE APPEAL
OF THE DENIAL OF R.W.T.'S
APPLICATION FOR A
FIREARMS PURCHASER
IDENTIFICATION CARD AND
A HANDGUN PURCHASE PERMIT.

_____

APPROVED FOR PUBLICATION

December 22, 2023

APPELLATE DIVISION

Submitted November 9, 2023 – Decided December 22, 2023

Before Judges Currier, Firko and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. GPA-BER-0011-22.

Evan F. Nappen Attorney at Law, attorneys for appellant R.W.T. (Louis P. Nappen, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent State of New Jersey (K. Charles Deutsch, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

This matter presents a question of first impression concerning the rights and responsibilities of New Jersey gun permit applicants under the Second

Amendment to the United States Constitution. Petitioner R.W.T.[1] appeals a July 8, 2022 Law Division order denying his application for a Firearms Purchaser Identification Card (FPIC) and a permit to purchase a handgun (PPH). After conducting an evidentiary hearing, the trial court issued an oral opinion denying petitioner's application on two independent grounds. The trial court found petitioner knowingly falsified information on the application, triggering disqualification pursuant to N.J.S.A. 2C:58-3(c)(3). The trial court also found petitioner was involved in past altercations with a neighbor, demonstrating his acquisition of a firearm "would not be in the interest of public health, safety or welfare" pursuant to N.J.S.A. 2C:58-3(c)(5). After carefully considering the record in light of the governing legal principles and arguments of the parties, we affirm the denial of petitioner's FPIC and PPH based on the trial court's finding he knowingly provided false information on his application.

Petitioner contends both statutory provisions the trial court relied upon violate the Second Amendment as recently interpreted by the United States Supreme Court in N.Y. State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. __, 142 S. Ct. 2111 (2022). In Bruen, the Court devised a new test for

---

[1] We refer to petitioner by initials because the trial court discussed medical records in rendering its decision. See R. 1:38-3(a)(2).

resolving Second Amendment challenges, displacing the "means-ends" test traditionally used to determine the constitutionality of a government regulation impinging on an individual's constitutional rights. Id. at 2117. The Court held the government must "not simply posit that the regulation promotes an important interest," but must demonstrate "the regulation is consistent with this Nation's historical tradition of firearm regulation." Id. at 2126. To pass the new test, the government must show there was "relevantly similar" regulation of the conduct when the Second and Fourteenth Amendments were adopted by presenting a "well-established and representative historical analogue. . . ." Id. at 2132-33 (emphasis omitted).

Applying this new "analogical" paradigm, we recently rejected a facial challenge to the constitutionality of the "public health, safety or welfare" disqualification criterion. See In re M.U.'s Application for a Handgun Purchase Permit, 475 N.J. Super. 148, 190-94 (App. Div. 2023). We have not yet had the occasion, however, to address the falsification disqualification provision's constitutionality. We now hold this provision survives Second Amendment scrutiny notwithstanding that, so far as we are aware, it has no historical analogue.

At first glance, this acknowledgment might seem to conflict with the United States Supreme Court's new emphasis on the historical regulation of

firearms.  See Bruen, 142 S. Ct. at 2133.  But the falsification disqualification provision's constitutionality follows inescapably from an important principle rooted in Bruen: states may establish a gun-licensing regime.  See Bruen, 142 S. Ct. at 2138 n.9.  Under such a licensing system, prospective gun purchasers or persons seeking to carry a firearm outside their home must obtain a permit.  The application for the permit prompts a background check to determine if there is a basis to overcome the presumption that the permit must be issued.

As a matter of rudimentary common sense, a jurisdiction with any such "shall issue" licensing regime may require applicants to provide truthful information on their applications, and correspondingly, may deny an application when false information is knowingly tendered.  Truthfulness on an application, after all, is an integral and indispensable part of the licensing process and applicants are not free to lie to the licensing authority without consequence.

Accordingly, the constitutionality of the falsification disqualification provision springs not from historical precursors, but rather from the constitutionality of the licensing regime itself.  Having acknowledged the constitutionality of the basic structure of a shall-issue licensing regime, Bruen signaled that laws safeguarding the integrity of such licensing systems without

A-3899-21

imposing additional substantive limits on who can purchase a gun will also be constitutional.

We further hold the trial court acted within its authority in making factual findings and applying those facts to the falsification disqualification provision. Denial of petitioner's application on that ground is supported by substantial and credible evidence and we decline to substitute our judgment for the trial court's judgment in assessing witness credibility. Accordingly, we affirm the denial because petitioner knowingly provided false information in his application.

Because the falsification disqualification provision categorically requires denial, we need not address petitioner's challenges to the trial court's determination that granting his application would be inimical to public health, safety or welfare under N.J.S.A. 2C:58-3(c)(5). We are mindful of the general principle that "[c]ourts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation." Randolph Town Ctr., L.P. v. Cnty. of Morris, 186 N.J. 78, 80 (2006). Here, resolution of petitioner's arguments pertaining to N.J.S.A. 2C:58-3(c)(5) are not imperative to this appeal's resolution because the denial of his FPIC/PPH application was required on other grounds.

I.

In January 2022, petitioner applied for an FPIC and a PPH. The Upper Saddle River Police Department chief denied the application on the grounds that it "would not be in the interest of public health, safety or welfare" pursuant to N.J.S.A. 2C:58-3(c)(5). Petitioner appealed the chief's decision to the Law Division pursuant to N.J.S.A. 2C:58-3(d). The trial court convened an evidentiary hearing at which multiple witnesses testified. We discern the following pertinent facts from the hearing.

## A.
### Background Information

Petitioner is a forty-three-year-old married man with three daughters. He earned a Bachelor of Science degree in finance. Since childhood, petitioner has been an avid hunter and sportsman. He has no disqualifying felony convictions or juvenile delinquency adjudications, no domestic violence disorderly persons convictions, no domestic violence weapons forfeiture, no mental health commitments, and is not subject to a restraining order.

Petitioner provided two letters of recommendation. The trial court read them into the record and found they "attest to the good character of [petitioner], given their personal relationship with him." Petitioner also offered into evidence his New Jersey Division of Fish and Wildlife ID card and North Carolina Resources license.

## B.

6

## Falsification on Application Form

On his FPIC application, petitioner marked "no" in response to the question: "[h]ave you ever been attended, treated, or observed by any doctor or psychiatrist or at any hospital or mental institution on an impatient or outpatient basis for any mental or psychiatric condition?" At the evidentiary hearing, petitioner acknowledged he had in fact been treated by a psychiatrist in college for "a sports performance issue that was deemed to be a mental block." He could not remember the psychiatrist's name, or the exact number of times he visited the psychiatrist. When the trial court asked if he visited the psychiatrist more than once, petitioner replied, "I'm trying, Your Honor, the only reason I'm taking a pause is I've seen marriage counselors, and things of that nature. I don't know if that qualifies to [t]his question." The trial court responded, "I just heard testimony from you, you were asked, have you ever seen a psychiatrist, you hesitated. It was a very long pause."

After additional follow-up questions, petitioner also acknowledged he underwent marriage counseling with his ex-wife but could not recall "whether they were psychologists or psychiatrists." He also acknowledged he continued to receive counseling to deal with his post-divorce issues.

When asked why he did not disclose seeing a psychiatrist for the sports performance issue on his application, petitioner explained his doctor did not

deem the condition to be a "significant mental illness." Petitioner admitted that when he filled out the application, he recalled visiting the psychiatrist. He explained, "[t]he reason I answered no, Your Honor, is I didn't know that that qualified as a mental condition for these purposes. I thought it was some simpl[e] therapy." The following exchange then occurred:

> THE COURT: But just to be clear again, when you answered no to the question as to whether you had ever been attended, treated or observed by any doctor or psychiatrist, when you answered no, you considered— you recalled and you considered your past of seeing a psychiatrist in college, correct?
>
> PETITONER: Frankly it didn't even come to mind, Your Honor. And I apologize—
>
> THE COURT: You just told me a few minutes ago that at the time you answered that question, you recalled seeing a psychiatrist in college.
>
> PETITIONER: Yes.
>
> THE COURT: You just told . . . that a few minutes ago.
>
> PETITIONER: Yes.
>
> THE COURT: Now you're telling me something totally different.
>
> PETITIONER: I'm sorry, no, Your Honor, I didn't mean to contradict myself, I'm sorry.
>
> THE COURT: Well maybe you didn't mean to contradict yourself, but you're contradicting yourself . . . . I have a concern when you tell me

A-3899-21

something a few minutes ago and then you contradict yourself right after it.

The trial court repeated its concern that petitioner had provided "completely different answers" and asked petitioner to explain himself. Petitioner answered, "[i]t was never my intention to mislead on the application or mislead this [c]ourt. I at the time did not even consider those incidents when I answered the question. I'm sorry when—."

The trial court interceded, stating, "[s]o when you told me initially when I asked you, did you recall seeing a psychiatrist, when you answered that question no, and then you gave me an explanation that you didn't believe what you were treated for fit or was applicable to that question, so that was incorrect?" Petitioner responded, "[y]es, Your Honor, that's correct." Based on petitioner's answer to the application's question concerning past mental health treatment and his contradictory testimony, the trial court concluded he knowingly falsified information in his application.

## C.
### Past Violence

Multiple witnesses testified about a February 29, 2020 incident that occurred at petitioner's home. Police received two 9-1-1 calls. One of the 9-1-1 calls was made by petitioner's wife. The other call was made by petitioner's neighbor, E.S., who was working as a contractor at petitioner's home.

When police arrived, they were told there had been a "dispute that turned physical" between petitioner and E.S. E.S.—who did not testify at the hearing—reported to the responding officer that petitioner "came into the house irate about the rate of [E.S.'s] production and began assaulting him." E.S. also told police petitioner struck him in the face and placed him in a chokehold, causing him to have an asthma attack that required medical attention. The trial court noted "[t]here [were] some visible injuries observed on [E.S.] with his bloody lip. He was having an asthma attack. Trouble breathing."

Petitioner reported E.S. "pushed him into the doorframe, causing [petitioner] to strike his head." Petitioner told police he "retaliated in self-defense." Petitioner's wife testified that E.S. grabbed petitioner by the side of the head and "slammed his head in the side of the door frame." Both combatants sustained injury, but no arrests were made and no criminal charges were filed.

The police chief testified he was concerned about granting petitioner's FPIC application because of the possibility of future violent incidents. The chief explained, "because of a report that there had been other incidents, that there's been a history of violent confrontations [between petitioner and E.S.]

10

. . . being that they're neighbors, was concerning in the fact that we had no idea whether there were any other incidents or not."

The trial court recognized the report concerning other confrontations between petitioner and E.S. was "based solely upon hearsay." The trial court also acknowledged that if E.S. was the aggressor and physically assaulted petitioner in his home, as petitioner and his wife claimed, petitioner "had every right to defend himself." However, the trial court expressed concerns with petitioner's credibility.

Furthermore, the trial court noted petitioner's testimony confirmed there had been a physical altercation. The trial court explained, "[y]ou corroborate that in your testimony, that there was a physical confrontation between you and [E.S.]. Okay. So that incident happened . . . . and there was a physical altercation or scuffle between you and [E.S.]. That is not hearsay. That's corroborated by your own testimony." The trial court also gave weight to the responding officer's testimony. Based on the foregoing evidence, the trial court concluded petitioner was "disqualified pursuant to [N.J.S.A.] 2C:58-3(c)(5), that it wouldn't be in the interest of public health, safety or welfare."

This appeal follows. Petitioner contends that under the Bruen analysis, both the falsification and public health, safety or welfare disqualification provisions are unconstitutional because they are inconsistent with our Nation's

historical regulation of firearms. He also contends the trial court erred in applying the falsification disqualification criterion because the information petitioner failed to disclose on the application was irrelevant and immaterial. Petitioner further argues he cured any deficiency by retracting and amending his application answer during the hearing. With respect to the public health, safety or welfare criterion, petitioner contends the trial court failed to explain why he constitutes a threat sufficient to deny him the right to purchase a firearm.

## II.

Applications for an FPIC or PPH are governed by N.J.S.A. 2C:58-3. The statutory framework "recognizes that the right to possess firearms is presumed, except for certain good cause." In re Z.L., 440 N.J. Super. 351, 355 (App. Div. 2015) (citing N.J.S.A. 2C:58-3(c)). The statute lists a series of disqualifying circumstances including, as we have already noted, one that specifically provides that no FPIC or PPH shall be issued "to any person who knowingly falsifies any information on the application form for a handgun purchase permit or firearms purchaser identification card." N.J.S.A. 2C:58-3(c)(3). The other statutory provision at issue in this case read at the time of

12

petitioner's application[2] that "[n]o [PPH or FPIC] shall be issued . . . to any person where the issuance would not be in the interest of the public health, safety or welfare."  N.J.S.A. 2C:58-3(c)(5) (Dec. 2022).

The statute requires the chief police officer or the superintendent of the State Police "to investigate the application to determine whether or not the applicant has become subject to any of the disabilities set forth in this chapter."  N.J.S.A. 2C:58-3(e).  A police chief's denial of an application for an FPIC/PPH is subject to de novo review by the Law Division.  In re Osworth, 365 N.J. Super. 72, 77 (App. Div. 2003) (citing Weston v. State, 60 N.J. 36, 45 (1972)).  "The chief has the burden of proving the existence of good cause for the denial by a preponderance of the evidence."  Ibid.  "[I]n evaluating the facts presented by the [c]hief, and the reasons given for rejection of the application the court should give appropriate consideration to the [c]hief's

_____

[2]  Following the hearing in this case, the statute was amended to bar issuance "[t]o any person where the issuance would not be in the interest of the public health, safety or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm. . . ."  N.J.S.A. 2C:58-3(c)(5) (Jan. 2023).  Because we are not addressing the facial or as-applied constitutionality of this disqualification criterion, we need not decide whether the original or revised version applies in this case—an issue not briefed by either party.  Nor do we address whether and how the additional language in the revised version might impact the Bruen analysis—an issue also not briefed by the parties.

investigative experience and to any expertise he appears to have developed in administering the statute." Weston, 60 N.J. at 46.

An appellate court's review of "a trial court's legal conclusions regarding firearms licenses [is] de novo." In re N.J. Firearms Purchaser Identification Card by Z.K., 440 N.J. Super. 394, 397 (App. Div. 2015). However, we must accept the trial court's fact findings if they are supported by substantial credible evidence. In re Return of Weapons to J.W.D., 149 N.J. 108, 116-17 (1997).

III.

We first address whether the falsification disqualification provision is unconstitutional on its face. We start by providing a succinct overview of foundational Second Amendment principles. The Second Amendment states: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In District of Columbia v. Heller, the United States Supreme Court identified the "core" of the Second Amendment as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. 570, 634-35 (2008). The Court nonetheless acknowledged "the right secured by the Second Amendment is not unlimited," adding that "nothing in our opinion

14

should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27. To underscore that point, the Heller Court noted these kinds of restrictions on the sale of firearms are "presumptively lawful." Id. at 627 n.26.

Two years later, a plurality of the Court reaffirmed that Heller "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons. . . .'" McDonald v. City of Chicago, 561 U.S. 742, 786 (2010). But the McDonald Court also clarified "that the Second Amendment right is fully applicable to the States" through the Fourteenth Amendment. Id. at 750.

That brings us to Bruen, which fundamentally changed the landscape of Second Amendment jurisprudence. Bruen involved a New York law criminalizing possession of a firearm without a license, both inside and outside the home. Bruen, 142 S. Ct. at 2122. To obtain a firearm license, the applicant had to demonstrate "proper cause," that is, "a special need for self-protection distinguishable from that of the general community." Id. at 2123 (citation omitted). The Court held the Second Amendment protects an individual's right to carry a handgun for self-defense both in and outside the home. Id. at 2122. The Court further held the proper cause requirement was unconstitutional because it "prevent[ed] law-abiding citizens with ordinary

15 <span>A-3899-21</span>

self-defense needs from exercising their right to keep and bear arms."  Id. at 2156.

Importantly, as we have already noted, Bruen fashioned an entirely new analytical framework for resolving Second Amendment challenges.  Under the new standard, the government must justify its regulation by demonstrating that it is "consistent with the Nation's historical tradition of firearm regulation."  Id. at 2129-30.  The Court explained this "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  Id. at 2133 (emphasis in original).  The Court cautioned, however, that "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'"  Ibid. (quoting Drummond v. Robinson, 9 F.4th 217, 226 (3d Cir. 2021)).  "To be clear," the Court explained, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check."  Ibid.

IV.

Petitioner argues the falsification disqualification provision runs afoul of Bruen because "[a]t the time of our Nation's founding, a citizen could be the

16

biggest liar in the country, yet still enjoy the right to keep and bear arms." We note at the outset that petitioner's framing of the argument misconstrues the falsification disqualification feature. The provision does not account for, much less depend on, the applicant's reputation for veracity, but rather looks at the truthfulness of the information within the four corners of the application. Although a falsification must be made knowingly to trigger disqualification, this statutory provision focuses on the application, not the applicant.

After carefully reviewing the text and underlying rationale of <u>Bruen</u>, we hold the falsification disqualification provision survives Second Amendment scrutiny notwithstanding that we cannot point to a historical analogue for it.[3] We need not cite historical precursors in this instance because the <u>Bruen</u> Court has already clarified that "shall-issue" licensing regimes[4] are permitted under

---

[3] In his brief, petitioner states, "[c]ounsel is unaware of any regulation in place against the general citizenry at the time of our Constitution's framing that barred citizens from exercising Second Amendment rights if they incorrectly filled out a firearm permit application form, or for that matter, any falsification allegation." We note the State in its responding brief has not identified any historical analogue for the challenged falsification disqualification provision.

[4] <u>Bruen</u>, 142 S. Ct. at 2138 n.9. N.J.S.A. 2C:58-3 falls within the rubric of a "shall issue" regime because an applicant may not be denied an FPIC or PPH unless he or she is subject to a statutorily specified disability. <u>See</u> N.J.S.A. 2C:58-3(f) ("There shall be no conditions or requirements added to the form or content of the application, or required by the licensing authority for the issuance of a permit or identification card, other than those that are specifically

A-3899-21

the Second Amendment so long as they contain "narrow, objective, and definitive standards to guide officials in determining whether applicants were 'in fact, "law-abiding, responsible citizens."'" State v. Wade, 476 N.J. Super. 490, 502 (App. Div. 2023) (quoting Bruen, 142 S. Ct. at 2138 n.9), leave to appeal denied, ___ N.J. ___ (2023). The Bruen Court recognized forty-three states have shall-issue licensing regimes, stressing that "nothing in our analysis should be interpreted to suggest the unconstitutionality [of those regimes]." Bruen, 142 S. Ct. at 2138 n.9; see Bruen, 142 S. Ct. at 2161 (Kavanaugh, J., concurring) ("[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense."); see also M.U., 475 N.J. Super. at 204 n.11 ("Bruen emphasized that its holdings did not effectuate a wholesale invalidation of the various states' gun licensing and permit systems.").

We deem it noteworthy that Bruen endorsed the concept of shall-issue licensing regimes without citing any historical analogues. The Court, in other words, acknowledged the constitutionality of modern licensing systems without identifying a single example of an 18th Century statute or ordinance requiring citizens to apply to a government agency for a permit before they

_____

set forth in this chapter."). We note petitioner does not dispute that he is challenging portions of a "shall-issue" licensing regime.

could purchase or carry a firearm. (Of course, there would be no precursors for a falsification disqualification provision if there are no historical analogues for modern licensing systems requiring gun permit applicants to submit a completed application.)

Relatedly, the Court expressly recognized modern gun-permitting regimes "often require applicants to undergo a background check. . . ." Bruen, 142 S. Ct. at 2138 n.9. But again, the Court did not mention any jurisdiction in early America that required prospective gun owners to undergo a background check by a government agency.

The Court's general acceptance of background checks provides important guidance in addressing the novel constitutional question before us. Requiring applicants to answer questions truthfully on a form is no more intrusive of Second Amendment rights than requiring background checks. Cf. United States v. Holden, 70 F.4th 1015, 1017 (7th Cir. 2023) (noting in a criminal prosecution for making a false statement to a firearms dealer that "Congress is entitled to require would-be purchasers to provide information—their names, addresses, Social Security numbers, criminal histories, and so on . . . . The power to collect accurate information is of a different character—and stands on a firmer footing—than the power to prohibit particular people from owning guns."). Indeed, answering the questions on an application form is the initial

step—and an essential part—of the background check process. Those answers provide basic information to facilitate a follow-up inquiry, if needed, by the agency responsible for conducting the background check.

Read in context, it is clear that Bruen's focus on the Nation's early history of firearm regulation pertains to the substantive criteria used by licensing regimes to deny applications, not to whether states may require citizens to file a truthful application for a gun permit. The falsification disqualification provision is sui generis among the statutory disqualification criteria set forth in N.J.S.A. 2C:58-3. Unlike the other disabilities, it does not focus on the applicant's background or suitability to possess a firearm. Rather, it is designed to safeguard the integrity of the licensing and background check process. In practical effect, this provision establishes a procedural bar to the issuance of an FPIC or PPH, not a substantive one. Stated another way, this provision does not impose substantive limitations on who is qualified to obtain a firearm. Indeed, anyone, regardless of their background or physical or mental health, can avoid falsification disqualification simply by telling the truth on their application.

Because Bruen allows states to require individuals to apply for a firearm license/permit, it logically follows that those states may also require the information in the application be complete and truthful. We deem a

falsification disqualification feature integral to and inseparable from the inherent structure of a gun-licensing regime. Because the United States Supreme Court has already endorsed the concept of shall-issue licensing regimes, we must presume that an implementing law safeguarding the integrity of any such regime by insisting the application is complete and truthful will likewise pass constitutional muster.

Relatedly, and even more simply, Bruen carefully instructs:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."
>
> [Id. at 2129-30 (emphasis added) (quoting Konigsberg v. State Bar of Cal., 366 U.S. 36, 50 n.10 (1961)).]

It is clear the Second Amendment's plain text does not cover lying on an application. That conduct is simply not protected by the Second Amendment and so regulation of that conduct is not subject to the analogical test. Petitioner's facial challenge to the falsification disqualification feature thus fails under the threshold question raised in the Bruen analysis.

V.

21

A-3899-21

We next consider whether the testimony elicited at the hearing established by a preponderance of the evidence that petitioner knowingly falsified any information on his application, triggering disqualification for falsification. We address petitioner's three arguments: (1) the inaccurate answer on his FPIC/PPH application was not material to the determination of whether he is fit to purchase a gun, (2) he "cured" any deficiency in his application by explaining and retracting his answer during the hearing, and (3) the trial court erred in concluding he knowingly falsified information on his application.

A.
Materiality

Petitioner contends the falsification disqualification provision applies only to material falsifications and that his answer to the question pertaining to past treatment for a mental or psychiatric condition was "irrelevant and immaterial to his current eligibility [for an FPIC or PPH]." He further contends "what matters is not whether a person falsifies, but whether the falsification is relevant and material."

We disagree. Petitioner's argument belies the plain language of N.J.S.A. 2C:58-3(c)(3), which expressly and unequivocally provides that an FPIC or PPH shall not be issued to an applicant "who knowingly falsifie[d] any information on the application form. . . ." (emphasis added). "Where 'a

22                                                          A-3899-21

statute's plain language is clear, we apply that plain meaning and end our inquiry.'" In re Registrant H.D., 241 N.J. 412, 418 (2020) (quoting Garden State Check Cashing Serv., Inc. v. Dep't of Banking & Ins., 237 N.J. 482, 489 (2019)). Courts must not "rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language." State v. Frye, 217 N.J. 566, 575 (2014) (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)). It is also well-established that when the Legislature uses the word "any," the intent is to cover all applications. See State v. Pleva, 203 N.J. Super. 178, 188-89 (App. Div. 1985).

Petitioner asks us to engraft onto N.J.S.A. 2C:58-3(c)(3) the materiality element of the crime of perjury found in N.J.S.A. 2C:28-1(b).[5] We have

---

[5] N.J.S.A. 2C:28-1(b) provides:

> Falsification is material, regardless of the admissibility of the statement under rules of evidence, if it could have affected the course or outcome of the proceeding or the disposition of the matter. It is no defense that the declarant mistakenly believed the falsification to be immaterial. Whether a falsification is material is a question of law.

In State v. Anderson, 127 N.J. 191 (1992), the Court invalidated the last sentence in N.J.S.A. 2C:28-1(b), holding the materiality of a falsehood is an element of perjury that must be proved to a jury beyond a reasonable doubt. Id. at 194-95, 206.

neither cause nor authority to rewrite the falsification disqualification provision as petitioner suggests. For one thing, N.J.S.A. 2C:58-3(c)(3) is not a criminal statute. Petitioner has not been charged with an offense for providing false information. The material elements of the crime of perjury have no relationship to the purpose and scope of the falsification disqualification provision. Unlike a criminal falsification statute, this regulatory provision is not designed to punish. Rather, it is designed to safeguard the integrity of New Jersey's gun-permit system.

But even more fundamentally, the comprehensive definition of materiality in the perjury statute shows the Legislature knows full well how to indicate when a falsehood needs to be material to warrant condemnation under a particular statute. See N.J.S.A. 2C:28-1(b). Notably, the crime of false swearing, N.J.S.A. 2C:28-2, does not require that the false statement be material because it does not incorporate by reference N.J.S.A. 2C:28-1(b). See State v. Neal, 361 N.J. Super. 522, 527-28 (App. Div. 2003). So too, the unsworn falsification offense, N.J.S.A. 2C:28-3, which applies to statements made on a form bearing notice that false statements made therein are punishable, does not incorporate by reference the materiality element from the perjury statute. These examples confirm a falsehood must be material only when the Legislature expressly so provides. We add that the falsification

24                                                                    A-3899-21

crime specifically referenced in the application's warning, N.J.S.A. 2C:39-10(c), likewise does not include or incorporate a materiality element. That statute provides:

> Any person who gives or causes to be given <u>any</u> false information, or signs a fictitious name or address, in applying for a firearms purchaser identification card, a permit to purchase a handgun, a permit to carry a handgun, a permit to possess a machine gun, a permit to possess an assault firearm, or in completing the certificate or any other instrument required by law in purchasing or otherwise acquiring delivery of any rifle, shotgun, handgun, machine gun, or assault firearm or any other firearm, is guilty of a crime of the third degree.
>
> [N.J.S.A. 2C:39-10(c) (emphasis added).]

Although we need not look beyond the plain text of the falsification disqualification statute, we note that invoking FPIC/PPH disqualification when <u>any</u> falsification is tendered is consistent with the application's underlying function, which is to provide information to facilitate the police chief's background investigation. See <u>H.D.</u>, 241 N.J. at 418.

In reaching that conclusion, we acknowledge and stress that a "yes" answer to the psychiatric treatment question does not by itself provide a basis upon which to deny an FPIC/PPH application. Petitioner might well be correct that ultimately, his prior mental health treatment has little or no bearing on his present fitness to own a firearm. But petitioner's argument puts the cart before

25

the proverbial horse. The requirement for complete truthfulness on an FPIC/PPH application is not just designed to disclose circumstances that would automatically justify denying the application. Rather, the requirement for absolute truthfulness serves to facilitate the police chief's background investigation by revealing information that may warrant a follow-up inquiry. See N.J.S.A. 2C:58-3(e) ("[T]he chief police officer or the superintendent shall proceed to investigate the application to determine whether or not the applicant has become subject to any of the disabilities set forth in this chapter."). The follow-up investigation may lead to other relevant information regarding the applicant's present fitness to be entrusted with a firearm.

It bears noting the Legislature's decision to mandate disqualification for any knowingly false statement serves as an incentive for FPIC/PPH applicants to be complete in their answers. It also discourages applicants from making their own judgment of what information might be relevant. Indeed, that is exactly what happened here. At one point during the hearing, petitioner claimed he did not reveal his prior mental health treatment by a psychiatrist in his application because the psychiatrist did not deem it a "significant mental illness." Petitioner thus took it upon himself to decide his prior psychiatric treatment was immaterial, that is, irrelevant to his fitness to purchase a firearm. But under the de novo review framework recognized in Osworth, it is

for a Law Division judge after a hearing, not an applicant before the hearing, to determine whether evidence of mental health treatment warrants denying an FPIC/PPH application. 365 N.J. Super. at 77.

We add the FPIC/PPH application form gives clear warning that <u>no</u> false or incomplete statement will be tolerated. The form states:

> I hereby certify that the answers given on this application are <u>complete, true and correct in every particular</u>. I realize that if any of the foregoing answers made by me are false, I am subject to punishment. Falsifications on this form is a crime of the third degree as provided in N.J.S.[A.] 2C:39-10(c).

> (emphasis added).

But even if we accepted, for the sake of argument, that the Legislature intended only to disqualify applications with material falsifications, petitioner's application must still be denied on that ground. N.J.S.A. 2C:58-3(e) expressly provides the certification form prescribed by the State Police superintendent pursuant to N.J.S.A. 2C:58-3(b)(1) must set forth:

> whether the applicant has been attended, treated or observed by any doctor or psychiatrist or at any hospital or mental institution on an inpatient or outpatient basis for any mental or psychiatric condition, giving the name and location of the doctor, psychiatrist, hospital or institution and the dates of the occurrence. . . .

This shows a legislative determination that this information is relevant and material for the background investigation into an applicant's fitness to

purchase a firearm. The undeniable relationship between mental illness and the numerous mass-shootings around the Nation plainly shows why the Legislature deemed it necessary to require gun permit applicants not only to disclose whether they have ever been treated by a doctor or psychiatrist for a mental or psychiatric condition, but also to disclose when and where the treatment occurred so that a police chief can conduct an appropriate follow-up inquiry.[6]

## B.
## Retraction

---

[6] We note the disclaimer portion of the application form states in pertinent part:

> I am aware of my rights under N.J.S.A. 30:4-24.3, and the Health Insurance [Portability and] Accountability Act (HIPPA), 45 C.F.R. 164-50, and consent to the disclosure of my mental health records, including disclosure of the fact that said records may have been expunged, to the [c]hief of [p]olice and the [s]uperintendent of State Police, or their designees, for the purpose of verifying my firearms permit application and my fitness to own a firearm under N.J.S.A. 2C:58-3. **I understand that this authorization shall be considered sufficient authorization for the release of records or for the disclosure of the fact of the expungement.**

(emphasis in original).

Petitioner argues he "cured" any falsifications by amending and retracting his application answer during the hearing. He notes his "disclosure [that he had been treated by a psychiatrist] occurred before any decision was made regarding his application by the [c]ourt below and against petitioner's self-interest since no one else was even aware of it."

In support of his argument, petitioner asks us to incorporate the "retraction" affirmative defense to a criminal prosecution for perjury or false swearing.[7] But as we have already noted, petitioner has not been charged with a crime and so an "affirmative defense" that can be raised in a criminal prosecution has no bearing on a noncriminal, regulatory provision. See N.J.S.A. 2C:13-1(c). If the Legislature meant to allow false statements on an application to be corrected at the hearing authorized by N.J.S.A. 2C:58-3(d), it would have said so.

We add that unlike perjury, false swearing, and unsworn falsification to authorities, the falsification offense specifically referenced in the FPIC application, N.J.S.A. 2C:39-10(c), does not expressly incorporate by reference the retraction affirmative defense set forth in N.J.S.A. 2C:28-1(d). In other

---

[7] Under N.J.S.A. 2C:28-1(d), retraction is an affirmative defense if: "the actor retracted the falsification in the course of the proceeding or matter in which it was made prior to the termination of the proceeding or matter without having caused irreparable harm to any party."

29

words, the crime specifically addressing false information on an FPIC application does not recognize a retraction defense. Since the Legislature clearly knows how to incorporate the retraction affirmative defense codified in N.J.S.A. 2C:28-2(d) by reference, we presume its omission from the crime designed specifically to punish falsifications in an FPIC/PPH application was intentional. See Frye, 217 N.J. at 575 (Courts must not "'presume that the Legislature intended something other than that expressed by way of the plain language.'") (quoting O'Connell, 171 N.J. at ). In sum, we read N.J.S.A. 2C:58-3(c) to mean an FPIC/PPH application that includes a knowing falsehood is disqualified at the moment it is filed and cannot be rehabilitated by an admission made later at a Law Division hearing.

We note, moreover, that in this instance, petitioner did not retract his falsification on his own initiative. This is not a situation where an applicant withdrew the application and replaced it with one that included completely accurate information. Petitioner's false answer was first exposed during the hearing while being cross-examined by the prosecutor. As the trial court aptly noted, when asked a direct question, and after taking "a very long pause," petitioner for the first time admitted he had in fact visited a psychiatrist. By failing to disclose his mental health treatment in his application, petitioner precluded the police chief from investigating his mental health history prior to

30

the hearing. The admission thus came too late to avoid the mandatory disqualification feature.

Finally, with respect to petitioner's retraction contention, we reject his argument that "[a]ll NJ FPIC disqualifiers have potential 'cures,' which make applicants eligible when they previously may not have been." In support of that argument, petitioner points to the fact that a disqualifying restraining order can be dismissed or vacated, alcoholics can obtain a professional certification indicating they are safe to handle firearms, a minor can reach the age of majority, and convicted felons may obtain an expungement. See N.J.S.A. 2C:58-3(c)(1)-(4).

That is all true. But those examples of changed circumstances do not support petitioner's argument that a knowing falsification in an application can be rehabilitated through retraction at a Law Division hearing on de novo review of a denial by the police chief. Any such falsification could result in a police chief approving a permit request that might otherwise have been denied. In that event, there would be no opportunity for a belated "retraction" at a hearing because no hearing would be convened.

## C.
### Finding of Knowing Falsification

We next turn to petitioner's contention the court erred in finding he knowingly falsified information on his application. As we have noted, we are

31

bound to accept the trial court's fact findings in a gun permit hearing if they are supported by substantial credible evidence. See J.W.D., 149 N.J. at 116-17.

Here, the trial court made extensive factual findings with regard to the falsification, and those findings are based on petitioner's own testimony and the trial court's assessment of his credibility. We reproduce the trial court's thorough explanation for its conclusion:

> I need to be clear about this for the record. When he's asked about this initially, he has a clear recollection of seeing a psychiatrist, I mean there's some waffling, first he says does a psychologist count. Then again I think there's a clarification that in fact this was a psychiatrist. . . .
>
> I asked you whether or not you did any research before filling out the application. You said you did, some online articles. You gave an explanation, okay, as to why you answered no. You tried to explain that the reason why you answered no was, that at the time you answered that question, you recalled seeking help for this mental block, with a psychiatrist, but you didn't feel that whatever you were treated for, whatever you sought that help for, was within the scope of what you should have disclosed in this question. Okay?
>
> Okay, if you're being honest, that's a reasonable explanation . . . Now mind you, I have no other evidence before me regarding your past psychological or psychiatric treatment . . . This is coming all from you. Okay. So I have to make a determination. . . .

That is the problem here. Okay? Because then I have to decide, do I accept what you're telling me, all right, where you contradict yourself completely, within a space of a few minutes, when it deals with whether or not you've ever been treated by a psychiatrist, how do I know you're telling the truth? How do I know you didn't seek treatment for some other condition? Okay.

Now when I add to that the fact that you testified, and there's nothing wrong with seeking marriage counseling, or counseling before you, because you go through a difficult situation . . . .

Okay, so I'm left with making credibility findings here. And I simply cannot ignore that you give me a detailed explanation as why you answer no, and then you completely contradict yourself and say well it really didn't come to mind at all.

For that reason, I do find that the State has met its burden by a preponderance of the evidence, that you've knowingly falsified your FPIC application. It's common sense. How could I conclude otherwise? Okay. Because if I conclude otherwise, I would have to accept that your initial answer to me with your explanation that you sought help or treatment for a mental block and you saw a psychiatrist for a certain period of time. And you did research online when you answered the application. And you didn't feel that whatever you went to the psychiatrist for and sought treatment for, wasn't within the scope of that question. If I'm to accept that, well it didn't really come to mind, how can I ignore that you gave me completely incorrect and false answer to when you were first asked about that. How do I ignore that? I can't . . . .

So not only do I find that there's been knowing falsification, you told me at the time you answered no, you were aware and recalled that you had seen a

33

psychiatrist. You told me that. Those are your words. I'm not making this up. These are your words. And it's not only the knowing falsification, it's the contradictory answers that give me concern.

Given the deferential standard of our review of fact findings, we have no basis upon which to disturb the trial court's conclusion that petitioner knowingly falsified information on his application. Despite petitioner's claims, the trial court did not inappropriately consider petitioner's mental health or treatment history. The trial court properly focused on petitioner's failure to disclose his mental health treatment on his FPIC/PPH application and on the contradictory statements he made during the hearing. The trial court mentioned petitioner's mental health to express concern about his credibility, commenting, "how do I know you're telling the truth? How do I know you didn't seek treatment for some other condition?" We see nothing inappropriate in the court posing those rhetorical questions in the context of deciding whether petitioner had knowingly falsified information on his application. Indeed, as we have noted, falsification disqualification was properly invoked in this case in part because petitioner's inaccurate answer inhibited the police chief from investigating "whether or not the applicant has become subject to any of the disabilities set forth in this chapter." N.J.S.A. 2C:58-3(e).

VI.

34                                                                                    A-3899-21

Finally, we turn to petitioner's contention the trial court erred in denying his application on the grounds that issuing an FPIC or PPH would not be in the interest of public health, safety or welfare pursuant to N.J.S.A. 2C:58-3(c)(5). Petitioner repeats the constitutional arguments raised in M.U. See M.U., 475 N.J. Super. at 169-71. He also contends the trial court failed to explain how and why he constitutes a threat if he was allowed to purchase a gun.

As a general proposition, under the doctrine of constitutional avoidance, courts "strive to avoid reaching constitutional questions unless required to do so." Comm. to Recall Robert Menendez from the Off. of U.S. Senator v. Wells, 204 N.J. 79, 95 (2010). Relatedly, "as a matter of judicial restraint, 'courts should not decide cases where a judgment cannot grant relief.'" Marjarum v. Twp. of Hamilton, 336 N.J. Super. 85, 92 (App. Div. 2000) (quoting Cinque v. N.J. Dep't of Corrs., 261 N.J. Super. 242, 243-44 (App. Div. 1993)). Here, as-applied constitutional scrutiny of the public health, safety and welfare provision, which has since been amended, see supra note 2, could have no bearing on the ultimate outcome of this appeal since denial of petitioner's application is dictated by the falsification disqualification provision. Therefore, we need not address the trial court's determination that petitioner is unfit to purchase a firearm pursuant to N.J.S.A. 2C:58-3(c)(5).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3899-21