ROBERT L. WESTON, PLAINTIFF-APPELLANT, v. STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued October 26, 1971—Decided January 17, 1972.

38

Mr. *James H. Klein* argued the cause for plaintiff-appellant (*Messrs. Klein, Melletz & Klein,* attorneys).

Mr. *Gerard J. DiNicola,* Prosecutor of Salem County argued the cause for defendant-respondent.

Mr. *Fred H. Kumpf,* Deputy Attorney General, argued the cause for the Attorney General, intervenor (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mr. Kumpf* and *Miss Phyllis J. Kessler,* Law Student Assistant, on the brief).

The opinion of the Court was delivered by

FRANCIS, J.   On August 1, 1968, pursuant to *N. J. S. A.* 2A:151–32–35, Weston applied to the Chief of Police of the Township of Pennsville, Salem County, for a firearms purchaser identification card. The application was denied.

No request was made to the County Court within the prescribed 30 day period thereafter for a hearing to review the denial. *N. J. S. A.* 2A:151–34. Upon learning that the passage of time had barred action by the County Court, on January 12, 1969 Weston filed a second application for the card with the Chief of Police. This resulted in a second denial because in the opinion of the Chief "issuance of a Firearms Purchaser's Identification Card would not be in the interest of the public health, safety or welfare." A timely request followed for a hearing in the County Court as to the propriety of the denial. The County Court affirmed the Police Chief's action, and Weston's subsequent appeal to the Appellate Division was certified on our own motion for disposition in this Court.

Under the Gun Control Law, *L.* 1966, *c.* 60 § 25, *N. J. S. A.* 2A:151–32, subd. B no person may purchase a rifle or shotgun unless he possesses a valid firearms purchaser identification card, shows it to the seller and signs a written certification indicating that he presently complies with *N. J. S. A.* 2A:151–33, which sets forth the qualifications for obtaining and holding such a card. Section 33 provides:

No person of good character and who is of good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in this section or other sections of this chapter, shall be denied a permit to purchase a pistol or revolver or a firearms purchaser identification card, except as hereinafter set forth:

a. No pistol or revolver purchase permit or firearms purchaser identification card shall be issued to any person who has ever been convicted of any crime, to any person addicted to narcotics, or who is a habitual user of goofballs or pep pills, to any person who is confined for a mental disorder to a hospital, mental institution or sanitarium, or to any person who is presently a habitual drunkard; or

b. To any person who suffers from a physical defect or sickness which would make it unsafe for him to handle firearms, to any person who has ever been confined for a mental disorder, or to any alcoholic, unless any of the foregoing persons produce a certificate of a medical doctor or psychiatrist licensed in New Jersey, or other satisfactory proof, that he is no longer suffering from that particular disability in such a manner that would interfere with or handicap him in handling of firearms; or

c. To any person under the age of 18 years; or

d. To any person where the issuance would not be in the interest of the public health, safety or welfare.

The statute requires the applicant to complete a form prescribed by the Superintendent of State Police, and when there exists an organized full-time police department in the municipality of the applicant's residence (as in this case), the completed and signed form containing the names and addresses of two reputable citizens personally acquainted with him must be filed with the chief of police. *N. J. S. A.* 2A:151–34, –35. The interrogatories set out in the form to be answered by the applicant relate to and are required to be limited to the qualifications for a firearms purchaser identification card outlined in Section 33 above. Upon the filing of the completed form with him, the chief of police is obliged to "investigate the application to determine whether or not the applicant has become subject to any of the disabilities set forth in" the statute. Upon completion of the investigation, "unless good cause for the denial thereof appears [the chief of police] shall grant * * * the identification card." *N. J. S. A.* 2A:151–35, –36.

Weston's 1968 and 1969 applications inquired as to whether he had "been attended, treated or observed by any doctor or psychiatrist, or at any hospital or mental institution on an in-patient or out-patient basis for any mental or psychiatric condition." He answered in the affirmative, saying that he had been treated in the Salem County Guidance Center in 1966. In the 1969 form he had indicated that the problem for which he sought guidance at the Center was "environmental" and that he had been given a "clean bill of health" by Dr. Gilpatrick. In 1968 the reason given for his purchase of firearms was "hunting, formal marksmanship competition"; In 1969 the purpose specified was "trap, skeet and target shooting."

Investigation of the 1968 application by Police Chief Dwyer of Pennsville included a visit by himself or a member of his department to the Salem County Guidance Center and

an interview with a doctor associated with the Center. The doctor is said to have advised against the grant of Weston's request for permission to purchase a firearm. On that basis the Chief denied a firearms purchaser identification card by letter which simply stated the denial without any specification of reasons.

It seems obvious from the record that Weston discussed the actual basis for the rejection with the Chief, and asked him to reconsider in light of *N. J. S. A.* 2A:151–33(b). This section provides in part that treatment for a mental disorder shall disqualify an applicant unless he produces "a certificate of a medical doctor or psychiatrist licensed in New Jersey, or other satisfactory proof, that he is no longer suffering from that particular disability in such a manner that would interfere with or handicap him in the handling of firearms." Thereafter, on October 3, 1968, Weston delivered to the Chief a certificate from Dr. Charles E. Gilpatrick, a general practitioner of the area. The doctor who had known Weston for 20 years certified that he had always been in good general physical condition and "has never shown any signs or symptoms of paranoid or suicidal tendencies, antisocial trends or mental illness." The certificate contained no reference to Weston's treatment at the Salem County Guidance Center or the result thereof. When the Chief adhered to his original decision, the second application, that of January 12, 1969, was filed. Further investigation was engaged in by the Chief's subordinates which, as he notified Weston, still revealed that issuance of the firearms purchaser identification card "would not be in the interest of the public health, safety or welfare." The Chief's testimony at the County Court hearing, although somewhat conflicting at times, indicated that the second rejection was based on the results of investigation of both applications.

At the hearing in the County Court pursuant to Weston's request therefor under *N. J. S. A.* 2A:151–34, the court and the parties were unsure and in conflict as to the procedure that ought to be followed by the Chief of Police in passing

upon applications for identification cards, and thereafter by the County Court in reviewing his action. The problem not having been considered by the courts prior to this time, an expression of our views on the subject seems appropriate.

■ The Legislature committed the original decision as to whether a firearms purchaser identification card should be granted to the discretion of the chief of police (in municipalities having full-time police departments), subject to standards which have been adjudged constitutionally adequate. *Burton, et al. v. Sills,* 53 *N. J.* 86 (1968), *appeal dismissed* 394 *U. S.* 812, 89 S. Ct. 1486, 22 *L. Ed.* 2d 748 (1969); *Application of Marvin, Jr.,* 53 *N. J.* 147, 151, *cert. denied* 396 *U. S.* 821, 90 S. Ct. 62, 24 *L. Ed.* 2d 72 (1969). On receipt of Weston's completed application, the Chief of Police was obliged to conduct a good faith investigation within the limits prescribed by *N. J. S. A.* 2A:151–33, and to issue the identification card unless good cause for denial thereof appeared as measured by the cited section. The legislative language seems to impose on the Chief of Police a duty in the first instance to look with favor upon the grant of the application. It says that "[n]o person of good character and who is of good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in [the Act] shall be denied * * * a firearms purchaser identification card * * *." To emphasize that purpose and to guard against its arbitrary subversion, further provision was made for easy and expeditious appeal to the county court. *N. J. S. A.* 2A:151–34; *Burton, et al. v. Sills, supra,* 53 *N. J.* at 91.

■ In performing his administrative function the chief of police proceeds informally, acting either personally or through members of his department in gathering the information upon which his decision is then based. If upon completion of the investigation he decides to deny the application, in the absence of any statutory requirement, we see no obligation to hold a trial-type hearing before doing so. However, since the statute directs issuance of the purchaser

identification card unless good cause to the contrary appears, in our judgment an opportunity should be given to the applicant to discuss the matter with the Chief, to be informed of the reasons for the denial and to offer any pertinent explanation or information for the purpose of meeting the objections being raised.

Here the Chief of Police in dealing with Weston's first application did not hold a conference with him to discuss the reasons for the intended denial of the purchaser identification card. However, no prejudice resulted therefrom because, as noted above, soon thereafter the matter was discussed and Weston was given an opportunity to supply medical evidence that he was suffering from no mental disorder which would interfere with his handling of firearms. *N. J. S. A.* 2A:151–33(b). When the additional information was furnished, and following further investigation, the Chief held to his original decision to deny the firearms purchaser identification card, again fairness called for at least general disclosure of the basis for the denial. Only in that way could the applicant have reasonably made preparations to meet the objections if and when he sought a review in the County Court.

The request for a review hearing in the County Court must be made within 30 days after denial of the application, and a copy thereof served upon the chief of police and the superintendent of the State police. The statute directs also that the hearing shall be held and the record made within 30 days of the receipt of the application by the County Court. *N. J. S. A.* 2A:151–34. There is no specification as to the nature of the review or the procedure to be followed in presenting the matter. In such cases courts must instinctively sense whether the right or privilege involved warrants an independent review of the local administrative official's determination. Obviously in these days of pervasive technocracy, the judiciary must provide protection for the individual against the massive apparatus of government. Its obligation is to create a workable remedy which serves the

one without unduly restricting the freedom of operation of the other.

██ The function of the Police Chief as the local administrative official charged with responsibility for the original decision to grant or withhold the firearms purchaser identification card involves largely the exercise of an informal discretion. Both his investigation of the application and his decision are made *ex parte* (except for the conference referred to above which the Chief should hold with the applicant in the future in instances where he decides to deny the application). When the investigation is completed, the results are related to the qualifications laid out in the statute (and to them alone, see *N. J. S. A.* 2A:151–36), and a determination reached by the Chief to grant or deny the application. The finality of that decision considered in the light of (1) the absence of any meaningful participation by the interested party in the process by which it is reached, and (2) the mandate of the statute that the applicant should receive the identification card "unless good cause for the denial appears," invests the Chief's action with a quasi-judicial patina or informal adjudicatory character. So viewed, it follows that the basic justice aimed at by the Legislature in expressly providing for judicial review, can be achieved fairly only by a *de novo* hearing in the County Court. *De novo* in this context contemplates introduction of relevant and material testimony and the application of an independent judgment to the testimony by the reviewing court. Such a judicial review compensates constitutionally for procedural deficiencies before the administrative official. *Jennings v. Mahoney,* 404 *U. S.* 25, 92 S. Ct. 180, 30 *L. Ed.* 2d 146 (1971); 1 *Davis, Administrative Law* § 710, p. 448 (1958); and see *Adams Theater Co. v. Keenan,* 12 *N. J.* 267 (1953); *Columbia Auto Loan, Inc. v. Jordan,* 90 *U. S.* App. D. C. 222, 196 *F.* 2d 568 (1952); *Weidner v. Kennedy,* 309 *F. Supp.* 1018 (C. D. Cal. 1970), 18 *U. S. C. A.* § 923 (f) (3); *Alta-Dena Dairy v. County of San Diego,* 271 *Cal. App.* 2d 66, 76

*Cal. Rptr.* 510, 517–518 (1969) ; *Parker v. Board of Barber Examiners,* 84 *So.* 2d 80, 86–87 (La. Ct. App. 1955).

Review in the County Court of the Police Chief's action should follow a pattern consistent with the direction of the Legislature as to the right of the citizen to receive a firearms purchaser identification card unless good cause appears for the denial thereof within the reasons specified for disqualification under *N. J. S. A.* 2A:151–33. Accordingly, in our view, the existence of good cause for the denial must represent a burden to be carried by the Police Chief, and to be established by a fair preponderance of the evidence. Of course, in evaluating the facts presented by the Chief, and the reasons given for rejection of the application, the court should give appropriate consideration to the Chief's investigative experience and to any expertise he appears to have developed in administering the statute.

At the outset of the County Court hearing, therefore, orderly and logical procedure calls for introduction through the testimony of the applicant of his application for the identification card, the rejection thereof and the reasons given by the Chief, if any. At this point he may be subjected to cross-examination by counsel for the Chief. Thereafter, the Chief should proceed with the evidence on which his denial was predicated. Ordinarily, this would include presentation of his own testimony, that of the members of the police department who made the investigation and furnished reports to the Chief, any available lay or professional persons who furnished information which influenced the action taken by the Chief, and any admissible documentary evidence which played a part in the adverse decision. Upon completion of the Chief's proof, the applicant may offer relevant rebuttal testimony.

At the hearing in this instance neither of Weston's two applications was put in evidence. The letter to him denying the first application was marked for identification and read into the record. It said only that his "application for firearms purchaser identification card is denied." The letter rejecting

the second application was neither produced, marked nor read. However, the Chief said Weston was notified that the card was denied pursuant to the provisions of *N. J. S. A.* 2A:151–33(d) (which says that such a card should not be issued "[t]o any person where the issuance would not be in the interest of the public health, safety or welfare"). Obviously these notifications were not very informative.

The Assistant Prosecutor who appeared at the hearing[1] in opposition to a reversal of the denial of Weston's application called the Chief of Police as his first and only witness. It appeared that the Chief had delegated the conduct of the investigation to two subordinates in his department who reported to him as to the results of interviews with various persons who knew Weston and who furnished information about him as well as personal opinions as to the advisability of granting him permission to acquire firearms. Five of the seven persons interviewed were fellow-employees of Weston's; all five viewed Weston's request with disfavor. In addition, apparently the records of the Salem County Guidance Center were examined and an interview had with a Dr. Emanual Catts who was connected with the Center.

In testifying, the Chief gave information not from personal knowledge but by reading from a report of the investigation. In doing so he said one co-worker characterized Weston as "way-out," another said he had a bad temperament and was unpredictable when angry, a third indicated he would not like to be in the woods with a gun-carrying Weston, and a fourth informed the investigator that Weston had said he would like to be a Green Beret so he could kill somebody. However, the Chief conceded that he personally had never heard of any incidents tending to show that Weston was unpredictable or violently aggressive.

---

[1]In cases involving actions of a local Chief of Police, the municipal attorney should appear on the County Court appeal. Where the matter is handled by the Superintendent of State Police, the Attorney General should provide representation for him on the appeal. *N. J. S. A.* 2A:151–34; *compare, Rules* 2:5–1(h); 3:23–9; 7:4–4(b).

The Chief declined to allow Weston's counsel to examine the report on the basis of which he was testifying, refused to furnish the names of the fellow-employees who were interviewed, and declined to give the information obtained from the Salem County Guidance Center records or from Dr. Catts. His position was that the investigation was confidential and should not be opened to an applicant's scrutiny. The trial court sustained his refusal, sharply limited the cross-examination, and also overruled Weston's objection that the Chief's testimony from the report was double hearsay since it was based entirely upon information furnished by investigators and allegedly obtained by them from persons interviewed. As the result of these rulings, cross-examination of the Chief was futile.

On rebuttal Weston testified in his own behalf from which it appeared that he had grown up in Pennsville and had lived at his present address for about 10 years. He had no criminal record of any kind and had never been involved in any fights or brawls. He was in the Army for at least eight and one-half years, three of which were spent in Germany and about 16 months in Korea. He received an honorable discharge and was never subjected to any disciplinary action during his long period of service. Part of the time he was involved in "security N. C. O. in a classified area"; but he never engaged in combat duty.

While in the Army Weston acquired considerable experience in the handling of firearms, and for about a year as company armorer he was responsible for the maintenance and safekeeping of 200 firearms. He had qualified as a rifle expert and in competition averaged a score in the 90s out of a possible 100. At the time of this hearing he owned two shotguns and a .22 rifle which were kept locked in a rack at his home. They were used in the hunting season for small game and deer, and out of season for trap and skeet shooting. He has owned guns for at least 15 years. He denied he ever told a fellow-employee that he would like to join the Green Berets so he could kill somebody. He did say he would like

to join that military unit because he thought it "is the best team going." But killing anyone was contrary to his beliefs as he held "human life sacred under all circumstances, even war time."

With respect to his treatment at the Salem County Guidance Center, he testified that in 1966 he had symptoms of anxiety tension on his job and he consulted the Center of his own accord. He attended there as an out-patient for five or six days during three of which he was examined and tested. Then he was discharged and told there was no need for him to return unless he felt the need to do so. He had never returned there or received any psychiatric advice or treatment from anyone since that time.

Moreover, Weston testified that after being informed by the Chief of the unfavorable report from the Guidance Center based upon the few visits there in 1966, he obtained examinations by a psychiatrist and by a family doctor, both of whom submitted reports. The psychiatrist said:

"His judgment is good. He has normal frustration tolerance. He is able to control anti-social impulses. * * * I see no reason why he should not be given a gun permit."

The family physician certified that he had known Weston for 20 years, and that at no time had he ever shown "signs or symptoms of paranoia or suicidal tendencies, anti-social trends or mental illness." In addition, on being shown the recent psychiatric examination report, Dr. L. J. Byerly, a psychiatrist who attended Weston at the Guidance Center, said that without re-examining the patient he would in general agree with the comments in the report.

Obviously, Weston's purpose in submitting to more recent psychiatric examination was to bring himself within the saving clause of subsection b of *N. J. S. A.* 2A:151-33 which apparently is designed to remove the prohibition against grant of the firearms purchaser identification card to a person who had been "confined for a mental disorder," if such person produces a "certificate of a medical doctor or psychiatrist li-

censed in New Jersey, or other satisfactory proof that he is no longer suffering from that particular disability in such a manner that would interfere with or handicap him in the handling of firearms."

After reserving decision, the trial court declared that the Chief's investigation was a confidential one and that its nature required admissibility of the hearsay testimony on which the rejection of the gun purchaser identification card was based. In its view, the County Court's decision on appeal had to be predicated upon a standard of probable reliability of the information revealed by the investigation of the applicant, rather than the hearsay character of the information. Finding that the Chief's testimony satisfied "a standard of reasonable reliability" within the contemplation of the authority delegated to him by the statute, the court concluded that it was not "in a position to make a judgment which could be substituted for that made by the Chief of Police in the performance of his duty." Consequently, it declined to overrule the Chief's rejection of Weston's application.

All of the foregoing makes it plain that the case for denial of the application by the Police Chief at the administrative level of decision rested entirely upon the hearsay reports given to him by his investigators. This was true also in the County Court where the Chief's testimony represented double hearsay consisting solely of the ministerial act of reading the same hearsay reports of interviews his subordinates told him they had with unidentified fellow-employees of Weston, and with some person or persons connected with the Guidance Center. Obviously, it is most difficult, if not impossible, for an applicant to meet damaging hearsay testimony of the kind presented by the Chief. In justice, an adverse decision of a County Court should not rest on such a record.

This is not to say, however, that in such a proceeding, whether administrative or on judicial review, the usual rules of evidence barring hearsay testimony should be regarded as controlling. It is common practice for ad-

ministrative agencies to receive hearsay evidence at their hearings. Express authorization may be found in specific statutes, for example, the Workmen's Compensation Act, *N. J. S. A.* 34:15–56, and the recently enacted Administrative Procedure Act, *N. J. S. A.* 52:14B–10(a). And we see no reason why on a *de novo* judicial review of an administrative official's decision relevant hearsay evidence of a credible character — of the type which responsible persons are accustomed to rely upon in the conduct of their serious affairs, which was received by the administrator, should not be admitted and considered by the court. As Judge Learned Hand said for the Court of Appeals for the Second Circuit in *NLRB v. Remington Rand, Inc.,* 94 *F.* 2d 862, 873 (1938), mere rumor would not support a board finding, "but hearsay may do so, at least if more is not conveniently available, and if in the end the finding is supported by the kind of evidence on which responsible persons are accustomed to rely in serious affairs." And see, *Goldsmith v. Kingsford,* 92 *N. H.* 442, 32 *A.* 2d 810 (1943); Annotation, "Comment Note. — Hearsay evidence in proceedings before the state administrative agencies," 36 *A. L. R.* 3d 12, 41, *et seq.* (1971). However, in our State as well as in many other jurisdictions the rule is that a fact finding or a legal determination cannot be based upon hearsay alone. Hearsay may be employed to corroborate competent proof, or competent proof may be supported or given added probative force by hearsay testimony. But in the final analysis for a court to sustain an administrative decision, which affects the substantial rights of a party, there must be a residuum of legal and competent evidence in the record to support it. *Gilligan v. International Paper Co.,* 24 *N. J.* 230, 236 (1957); *Helminsky v. Ford Motor Co.,* 111 *N. J. L.* 369, 373 (E. & A. 1933); *Griffin v. Heath,* 257 *A.* 2d 488 (D. C. Ct. App. 1969); *Carroll v. Knickerbocker Ice Co.,* 218 *N. Y.* 435, 113 *N. E.* 507 (1916); *Shields v. Hults,* 21 *A. D.* 2d 745, 250 *N. Y. S.* 2d 143 (1964); Annotation, 36 *A. L. R.* 3d *supra,* at 43–51; *cf. Jennings v.*

*Mahoney, supra,* 404 *U. S.* at 25, 92 S. Ct. 180, 30 *L. Ed.* 2d at 148.

It is not possible to state a hard and fast rule as to the extent hearsay may be utilized in evaluating the sufficiency of the evidentiary basis of a particular administrative determination. Suffice it to say that much may be left to the discretion of the administrative official who should be aware of the principle which warrants reception of hearsay, as well as the qualification thereon that the decision should not be predicated on hearsay alone. On judicial review, in deciding whether the evidence in its totality sustained the administrative conclusion, naturally the same rule of admissibility would apply. Of course more sensitive awareness would be expected of a court weighing the combined probative force of the relevant hearsay and the relevant competent evidence.

In the present case the denial of Weston's application at both the administrative and judicial level was based entirely upon hearsay evidence. He could not have been expected reasonably to overcome such faceless opposition, particularly since the identity of those whose adverse views formed the foundation of the judgment against him was not disclosed. For this reason there must be a reversal of the County Court ruling and a remand to give the Police Chief an opportunity to make a record which will satisfy fair hearing standards for this type of case, and which will afford Weston an opportunity to meet the case against him.

At this time we cannot specify in detail the exhibits which the Chief should produce or the witnesses to be called on the remand. Although the Chief seemed reluctant to say so, it is apparent from his testimony that the records of the Salem County Guidance Center and his interview with Dr. Catts of the Center played a substantial part in his decision against Weston. Appraisal of the matter in its present state indicates a need for production of both the doctor and the records. It may be that counsel for the parties can arrange for Weston to examine the records and to consult with Dr. Catts in advance of the rehearing. Such a course might

resolve the matter. If it does not, serious consideration may have to be given also at the rehearing to the identification or production, or both, of Weston's fellow-employees on whose unfavorable statements the Chief denied the firearms purchaser identification card. Ultimate decision on that aspect of the rehearing, *i. e.*, the evidence to be adduced in an effort to sustain the denial of Weston's application, must rest with the Chief and the reasonable discretion of the County Court in light of our discussion above.

The judgment of the County Court is reversed and the matter is remanded for proceedings in accordance herewith.

*For reversal and remandment* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For affirmance*—None.