# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0066-22

IN THE MATTER OF D.Z.

_____

Submitted December 18, 2023 — Decided January 17, 2024

Before Judges Marczyk and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Petition No. 0266 XTR 2022 000001.

Kalavruzos, Mumola, Hartman, Lento & Duff, LLC, attorneys for appellant D.Z. (William Les Hartman, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent State of New Jersey (K. Charles Deutsch, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

D.Z.[1] appeals from the trial court's August 9, 2022 final extreme risk protective order ("FERPO") entered against him. We affirm.

---

[1] Records relating to FERPO proceedings are confidential and shall not be disclosed to persons other than the respondent except for good cause shown.

I.

On May 23, 2022, Washington Township Police received a call from a concerned parent of a student at Westwood High School.  Corporal Michael Ferrarini responded to the home of the caller.  The caller's son, C.P., heard D.Z., who was fifteen years old, was going to "shoot up Westwood high school . . . [and] he doesn't care if he gets suspended, expelled, or goes to jail."  C.P. also told police D.Z. was targeting more than seven other named students at the school.  When Corporal Ferrarini asked C.P. why D.Z. was threatening other students, he stated there was a naked picture of D.Z. being circulated at school.

Washington Township Police contacted the Westwood Police Department because the school has students from both towns.  The Westwood dispatcher obtained information about D.Z. from the high school, and a record check of his residence showed C.W., a resident of the address and D.Z.'s step-grandfather,[2] applied for a handgun permit that year.

Corporal Ferrarini contacted A.M., a student who was a target of D.Z. according to C.P.  A.M. stated a girl contacted him by Instagram message and

Admin. Off. of the Cts., Admin. Directive #19-19, Guidelines for Extreme Risk Protective Orders attach. 1, Guideline 8(a) (Aug. 12, 2019) (hereinafter "AOC Directive").

[2] C.W. is referred to as D.Z.'s step-grandfather and also the boyfriend of D.Z.'s grandmother in the record.  We will refer to him as D.Z's grandfather for clarity.

2                                                          A-0066-22

claimed to be D.Z.'s ex-girlfriend. She also contacted two other students who were friends of A.M. The girl sent a video, purportedly of D.Z. masturbating, to three students. A.M. thought the video was funny and sent it to more friends at school.

A.M. stated the next day students were talking about the video at lunch. A.M.'s friend, C.S., texted D.Z., and D.Z. responded with his "list" of targets he wanted to hurt. A.M. further reported D.Z. texted him throughout the rest of the day about how he was going to hurt him. A.M. showed police screenshots of a Snapchat message conversation between himself and D.Z. A.M. told D.Z., "bringing a weapon to school is pussy shit." D.Z. responded, "oh it is? . . . [E]ither way [I]'m gonna get suspended or expelled."

Another student, C.S., gave a statement to Corporal Ferrarini. He stated D.Z. had texted his friend J.,[3] and J. relayed screenshots of the conversation to C.S. C.S. stated D.Z. "mostly threatened [A.M.,] wanting to hurt him and said that he has weapons at his house." In the text message exchange, J. asked D.Z. if he was going to kill anyone and D.Z. responded, "[you're] gonna have to find out [I guess]," and "[I]'m not fuckin around." When J. confronted D.Z. about a

---

[3] J. did not give a statement to police. He is identified only by his first initial because his last name does not appear in the record.

A-0066-22

possibility that he was going to "bomb the school," D.Z. stated he was not going to but "it could be worse," and alluded to "cops and violence." When asked if he owned any weapons, D.Z. stated, "yes," but they were his father's. J. later asked D.Z. if he owned a gun and if he was going to bring something to school. D.Z. first responded, "wtf." J. told D.Z. it was a valid question because he was threatening people's lives, and D.Z. responded, "THEY ARE FUCKIN WITH MY LIFE [J.]." J. said, "[s]o [you] want to kill them[.] [I]t's not the way," and D.Z. responded, "hurt them not kill."

Another concerned parent, C.R., reported concerns to police. C.R. told police his son showed him screenshots, one of a text message and another of a Snapchat message. The text message contained the list of students D.Z. was threatening. Another screenshot was of D.Z. "having a conversation with another kid about getting his feelings hurt and possibly hurting someone with a weapon."

Corporal Ferrarini and another officer filed for a temporary extreme risk protective order ("TERPO"), which was granted. Corporal Ferrarini and several other officers went to D.Z.'s residence to serve the TERPO. The officers spoke with C.W. outside of the residence and explained his grandson made statements involving weapons and the school, and the police therefore needed to collect all

4

A-0066-22

weapons and ammunition on the property for temporary safekeeping. C.W. let the police inside. Police told D.Z. they would not take a statement from him at that time. C.W. showed police the location of the guns in the home. There was a hunting rifle in a case in the living room closet, and a safe in the upstairs bedroom contained multiple long guns, shotguns, and two handguns. Police also collected all ammunition, knives, and a bow and arrows from the bedroom. Police created an inventory list with the items seized from the home.

The court conducted a FERPO hearing in August 2022. Corporal Ferrarini, D.Z., and C.W. testified. Corporal Ferrarini testified that after receiving the call from C.P.'s parent, he requested all the involved students to come to police headquarters with their parents. He stated the students were separated and wrote statements at separate times, so no one spoke to each other about what to write. He testified the students reported D.Z. and another student had a problem, and D.Z. "was threatening to bring his weapon to school." Multiple students showed him text messages, which "showed that his grandfather had weapons."

Corporal Ferrarini further testified he learned there was a video circulating, purportedly of D.Z. masturbating. The police did not see the video. He also testified D.Z. said "he doesn't want to kill anybody, he wants to hurt

A-0066-22

people . . . ." He stated when A.M. said bringing a weapon to school is "pussy shit," and D.Z. responded with "[o]h, is it? Either way, I'm going to get suspended or expelled[,]" the investigating officers were concerned.

D.Z. testified he had an online friendship with A.D., whom he never met in person. On May 20, 2022, D.Z. said he confronted A.D. about her claim she was a very good student and told her "[y]our mother did your school work for you, you never did any of your school work, all you do is play games all day[.]" After this conversation, D.Z. heard from a classmate that A.D. was sending a nude video of him to other students at the school. He testified the video was not of him, and he never shared nude images of himself through messaging or social media.

D.Z. stated classmates started to ask him about the video; "[ten] to [fifteen students] came up to [him]" during lunch. He testified the students made fun of him, he "informed them that it was not [him,]" and he was angered by the bullying. He said he was so angry he "want[ed] to have a fist fight with [A.M.] and possibly other people." D.Z. testified he never said he was going to bring a weapon to school, but he was asked by classmates about it. When asked about his response to A.M.'s message that "bringing a weapon to school was pussy shit," D.Z. said his reply was "out of sarcasm." D.Z. claimed if other students

did not bring up weapons, he "would have never mentioned weapons at all. . . . [I]t just escalated to a fight and then [A.M.] brought up weapons."[4]

C.W. testified he lived with D.Z. for approximately six years and dated D.Z.'s grandmother for many years before that. He said he owned several firearms, some of which he inherited from his brother, and others he acquired himself.[5] C.W. testified that "at some point [D.Z.] said to one of the kids, 'I should have punched him at lunch, even if I got suspended.' If he had punched him at lunch, we wouldn't even be here today." He told the court he had served in the Marine Corps and there, "when two guys are arguing, they would break out the boxing gloves and put the two guys together and the argument was

---

[4] D.Z. testified he did not have access to the firearms in his grandfather's house and that "[t]hey are locked up in[] a safe." Further, the gun found in the closet "has two locks on it and the reason why it's in the closet [is] because there is really no other [place] to store the firearm . . . without it being . . . completely visible in the house."

[5] C.W. testified the gun found in the living room closet "was in a rifle case [and] had two locks on it. . . . The only reason why it wasn't stored in the other locker with the other firearms was because it just wouldn't fit." He testified he only took the guns out of their locked containers when he went to the shooting range, and when he did, he would "take them out, come back [home], . . . unload them, make sure everything was safe, clean them and put them back in the gun safe." He testified he has never given D.Z. access to the guns. The only time D.Z. had access to the guns was if he went to the range with C.W. D.Z. had gone to the range and fired guns with C.W. at least four times.

A-0066-22

immediately settled and then the boxing gloves came off, they shook hands and [the] argument [was] over."

The court ultimately issued a FERPO. The court noted:

> [D.Z.] got frustrated, he got angry and there were threats made in the text messages. . . .
>
> [D.Z.] lives in a home where there are multiple firearms in the home and . . . [C.W.] testified that most of these firearms are under lock and key and he's a careful gun owner and I don't have any reason to doubt that.
>
> But one . . . of the guns was . . . in a closet, [D.Z.] has himself in the past handled firearms; albeit as [C.W.] testified[,] safely out on the range . . . .
>
> [T]he point is he's had exposure to guns. He's fired guns. . . . [T]hese were not idle or empty threats. He could have backed them up with a gun.
>
> . . . .
>
> [W]hen you have threats in school and you have guns . . . that's what I see in this case[,] and I see it very clearly and so this FERPO has to be issued.
>
> I . . . find factor one, there's a history of threats directed toward others. . . . I make the finding that on May 23[], 2022[,] the Washington Township Police received a call from the parent of [a] student[,] . . . there were students filling out statements[,] [and] [t]here were parents calling the school.
>
> . . . .

8

The threats consisted of [D.Z.] stating that he wanted to hurt certain individuals and he had a list of targets . . . .

[D.Z.] texted another student that his father owns weapons and then he made some statement about he didn't know what he was going to do; it just depended on how aggravated he was.

[D.Z.] testified . . . he had no intention of harming anybody; [he] doesn't have access to his grandfather's firearms and [C.W.] testified that [D.Z.] does not have access to any firearms.

But there is enough here for me to make the findings as to factor one and factor two. . . .

. . . .

[U]nder these circumstances, I don't have any choice but to issue this FERPO. It is absolutely warranted based upon this record.

On September 23, 2022, the court filed an amplification of its statement of reasons pursuant to Rule 2:5-1(b).[6] The court noted it found Corporal Ferrarini was a credible witness. It also found C.W. "generally credible, [but] he appeared to minimize the threats made by [D.Z.] against the other students."

The court further discussed its conclusion that factors one and two were implicated under N.J.S.A. 2C:58-23(f). It found factor one applied because D.Z.

---

[6] The court initially filed a statement of reasons on September 20, 2022, but amended its statement of reasons to correct a typographical error.

"has a history of threats or acts of violence against . . . others based upon the threats against other classmates . . . reported to police on May 23, 2022." Further, the court stated:

> [D.Z.]'s actions may have been precipitated by bullying, [but] his response to the bullying incident was not the correct response and caused fear amongst the students. The threat of gun violence in a school is an immediate red flag, which cannot be ignored by this court. Based upon [D.Z.]'s numerous threats to specific students as well as his statements about having access to weapons, recounted through police reports and screenshots[,] . . . the court found factor one.

In finding factor two, the history of use, attempted use, or threatened use of physical force against another person, the court stated it "relied on the same findings of fact set forth in factor one to find factor two." The court considered D.Z.'s "threats to bring a gun to school, threats regarding harming a list of students, and threats of harm directed to specific students." It found "the threat of gun violence in retaliation to the bullying incident coupled with the fact there were firearms in the home was of great concern to the court." The court further found "[e]qually concerning was [C.W.'s] minimization of the incident, and the clear testimony by [C.W.] that students should settle disputes through violence."

Based on the court's findings regarding factors one and two, it concluded the State demonstrated by a preponderance of the evidence D.Z. poses a

A-0066-22

significant danger of bodily injury to himself or others by owning or possessing a firearm.  This appeal followed.

## II.

Defendant raises the following issues on appeal:

POINT I

THE STATE FAILED TO MEET ITS BURDEN TO ESTABLISH THAT [D.Z.] POSES A SIGNIFICANT DANGER OF BODILY INJURY TO HIMSELF OR OTHERS BY HAVING WEAPONS.

POINT II

THE COURT BELOW ERRED BY RELYING ON HEARSAY THAT WAS UNSUPPORTED BY A RESIDUUM OF LEGAL AND COMPETENT EVIDENCE.

More particularly, D.Z. contends the FERPO was premised on a mere rumor he was going to bring a firearm to school.  At no point in his text message conversations with anyone did D.Z. say he was going to bring a gun to school. In fact, when confronted about whether he was going to bring something to school and if he owned a gun, D.Z. responded "wtf," indicating he found the assertion ridiculous.

D.Z. argues that because the State only called Corporal Ferrarini to testify, he was deprived of his ability to cross-examine the other officers as well as the

reporting students and their parents. He asserts the credibility of first-hand witnesses was important to determining whether D.Z. posed a "significant risk of bodily injury . . . by owning or receiving a firearm." Further, D.Z. maintains neither the record nor the court's reasons for issuing the FERPO suggest he posed a significant danger of bodily injury to self or others by ownership, possession, purchasing, or receipt of firearms. He asserts his response to the circulation of the video, including making a list of students, was "normal" and "understandable." Moreover, he denied he wanted to kill these students, only that he wanted to hurt them. As such, the State did not meet the burden of proof for the court to issue a FERPO.

Lastly, D.Z. argues that although the court was permitted to rely on hearsay, a court's conclusions must be supported by a "residuum of legal and competent evidence in the record . . . ." Weston v. State, 60 N.J. 36, 51 (1972). He notes only one investigator was called to testify, and that none of the students or parents testified, so he did not have an opportunity to question them on the reasonableness of their fear.

Our review of the trial court's findings of fact and credibility determinations is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "We are generally bound by trial court findings 'when supported by adequate, substantial,

credible evidence.'" In re D.L.B., 468 N.J. Super. 397, 416 (App. Div. 2021) (quoting Cesare, 154 N.J. at 411-12). "When evidence is testimonial and involves credibility questions, deference is 'especially appropriate' because the trial judge is the one who has observed the witnesses first-hand." Ibid. (quoting Cesare, 154 N.J. at 412). "An appellate court will not disturb a trial court's findings unless they 'went so wide of the mark that the judge was clearly mistaken.'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). However, the trial court must "find the facts" in its decision, Rule 1:7-4(a), and state "the reasons supporting its decision to grant or deny" the FERPO, AOC Directive, attach. 1, Guideline 6(a).

The Extreme Risk Protective Order Act of 2018 ("ERPO" or "the statute"), N.J.S.A. 2C:58-20 to -32, "empowers a court," upon proof by a preponderance of the evidence, to order the removal of "firearms from a person who 'poses a significant danger of bodily injury to . . . self or others' by possessing them." D.L.B., 468 N.J. Super. at 400 (omission in original) (quoting N.J.S.A. 2C:58-24(b)).

The AOC Directive summarizes the statute and promulgates Guidelines ("AOC Guidelines" or "Guideline") "that prescribe the process for obtaining orders" under the statute. Ibid.

In considering whether to grant a FERPO, N.J.S.A. 2C:58-23(f) requires the court to consider whether the person against whom the order is sought:

(1) has any history of threats or acts of violence by the [individual] directed toward self or others;

(2) has any history of use, attempted use, or threatened use of physical force by the [individual] against another person;

(3) is the subject of a temporary or final restraining order or has violated a temporary or final restraining order issued pursuant to the 'Prevention of Domestic Violence Act of 1991,' . . . ;

(4) is the subject of a temporary or final protective order or has violated a temporary or final protective order issued pursuant to the 'Sexual Assault Survivor Protection Act of 2015,' . . . ;

(5) has any prior arrests, pending charges, or convictions for a violent indictable crime or disorderly persons offense, stalking offense pursuant to [N.J.S.A. 2C:12-10], or domestic violence offense enumerated in [N.J.S.A. 2C:25-19];

(6) has any prior arrests, pending charges, or convictions for any offense involving cruelty to animals or any history of acts involving cruelty to animals;

(7) has any history of drug or alcohol abuse and recovery from this abuse; or

(8) has recently acquired a firearm, ammunition, or other deadly weapon.

14

Prior to issuing a FERPO, however, the court must also consider "any other relevant evidence[,]" including if the individual:

> (9) has recklessly used, displayed, or brandished a firearm;
>
> (10) has an existing or previous [ERPO] issued against him or her; and
>
> (11) has previously violated an [ERPO] issued against him or her.
>
> [AOC Directive, attach. 1, Guideline 3(d).][7]

---

[7] We recently held:

> Only if a court finds at least one of the eleven "behavioral" factors, then it "may consider," . . . four additional factors pertaining to a person's mental health – whether the [individual]:
>
> (12) has any prior involuntary commitment in a hospital or treatment facility for persons with psychiatric disabilities;
>
> (13) has received or is receiving mental health treatment;
>
> (14) has complied or has failed to comply with any mental health treatment; and
>
> (15) has received a diagnosis of a mental health disorder.

A-0066-22

No single factor is determinative. Rather, "[t]he court shall issue the FERPO order if it finds 'by a preponderance of the evidence at the hearing that the [individual] poses a significant danger of bodily injury to the [individual]'s self or others' by possessing a firearm." Id. at 406-07 (quoting N.J.S.A. 2C:58-24(b)).

"Importantly, '[t]he rules governing admissibility of evidence at trial shall not apply to the presentation and consideration of information at the [FERPO] hearing.'" D.L.B., 468 N.J. Super. at 406 (quoting AOC Directive, attach. 1, Guideline 5(c)). Thus, the court "may consider an affidavit and documents submitted in support of the petition, and may consider any information provided by the county prosecutor or designee." AOC Directive, attach. 1, Guideline 5(c). Presumably, an order cannot be based solely on hearsay; there must be a residuum of competent evidence in the record to support the issuance of a FERPO. D.L.B., 468 N.J. Super. at 406.

> [D.L.B., 468 N.J. Super. at 404 (citing AOC Directive, attach. 1, Guidelines 3(d), 5(d) (regarding TERPOS and FERPOs, respectively)).]

Because no evidence was presented to the court regard D.Z.'s mental health, these factors were not addressed.

A-0066-22

Applying these principles, we affirm the trial court's issuance of a FERPO against D.Z. substantially for the reasons set forth in the court's well-reasoned and comprehensive decision. We briefly add the following.

Initially, we determine the court did not improperly rely on hearsay in the matter. As noted, judges in FERPO hearings may consider hearsay, provided the decision is not based solely on hearsay. There must be a residuum of competent evidence in the record to support the issuance of a FERPO. Ibid. There is no indication the court based its decision entirely on hearsay. The court utilized legally competent evidence in conjunction with hearsay to support its findings. The court not only relied on the testimony of Corporal Ferrarini, it also considered D.Z.'s own statements in text messages, along with his actual testimony at the hearing. The court further relied on the testimony of C.W. In short, there was sufficient testimonial evidence, coupled with the hearsay, to support the court's decision.

We further observe the trial court was mindful that D.Z.'s "actions may have been precipitated by bullying . . . ." Nevertheless, the court properly analyzed the factors set forth in N.J.S.A. 2C:58-23(f) and determined respondent posed a significant danger to others. As the court noted, D.Z.'s actions in response to the circulation of the video caused fear among the students at his

17

high school which was not justified in any manner. The court's findings of fact and legal conclusions are amply supported by the record, and we discern no basis to disturb its ruling.

To the extent we have not specifically addressed any of D.Z.'s remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0066-22