**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2344-22

R.S.,

    Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT OF
HUMAN SERVICES,

    Respondent-Respondent.

_____

Submitted April 15, 2024 – Decided April 25, 2024

Before Judges Sabatino and Chase.

On appeal from New Jersey Department of Human Services; Office of Program Integrity and Accountability. Docket No. HSL 02080-2022.

Hark & Hark, attorneys for appellant (Richard Quinton Hark, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Melissa H. Raska, of counsel and on the brief; Andrew C. Munger, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner R.S.[1] appeals from the March 17, 2023 final agency decision of the Department of Human Services ("DHS"), reversing the Administrative Law Judge's ("ALJ") decision and placing him on the Central Registry of Offenders Against Individuals with Developmental Disabilities ("Central Registry")[2], pursuant to N.J.S.A. 30:6D-77.  We affirm.

I.

T.F. is an adult woman with Down syndrome, intellectual disabilities, and dementia.  She resides full-time at a state-run group home.  Her individualized service plan reflects the need for a high level of support for daily living activities and she has extremely limited verbal communication skills.  T.F. is short in stature, overweight, and typically wears "a size six women's shoe, or a child's size shoe . . . a medium[] or large top and . . . a size sixteen[] or eighteen in pants."

---

[1]  To protect the identity of the individuals, we refer to them by their initials.  R. 1:38-3(f)(8).

[2]  Placement on the Central Registry prohibits the listed offender from working for, or volunteering in, DHS funded programs, including employment in developmental centers, community agencies, and other programs licensed, contracted, or regulated by DHS.

Petitioner was employed at the group home as a residence manager with duties including "[f]ull financial responsibility (as delineated) of consumer funds, petty cash, and household accounts."

This matter arises from R.S. filing a Representative Payee Voucher, requesting $951 to be disbursed from T.F.'s account for the purchase of clothing on February 18, 2020. The documentary record reflects that, six days later, R.S. purchased six items from the athletic apparel store Finish Line, totaling $450, including a pair of slim-cut joggers; a Nike Club hooded sweatshirt; and two pairs of Nike Air Max sneakers, one in size six and the other in size nine. He also purchased $143.05 in clothing from J.C. Penney, including multiple pairs of pants labeled as "slim leg" or "skinny" cuts. R.S. also purchased $343.58 in items from Walmart, including multiple intimate items such as a pushup and "strappy" bras, camisoles, hipster-cut underwear, and pajama sets.

After reviewing some of the items R.S. purchased, staff became concerned they were inappropriate for T.F. and would need to be returned or exchanged. This was reported to the assistant manager, who relayed the information to R.S., but he disagreed. After searching T.F.'s entire room, closets, hampers, and staff areas, the staff members, including R.S., were unable to locate many of the items reflected on the receipts, including the intimate items, the size nine Nike

sneakers, the Nike joggers, and the Nike hooded sweatshirt. The staff members then contacted the home's assistant director to review the receipts and inventory the items.

By 5:00 p.m. on March 4, several items remained unlocated. R.S. left the facility at the end of his shift, which per the schedule was 4:00 p.m., but returned later. Another staff member observed R.S. enter T.F.'s bedroom and then leave the facility. After R.S.'s off-hours visit, the Nike joggers and sweatshirt were discovered in T.F.'s hamper and the size nine Nike sneakers were discovered behind a dry erase board in the staff office's closet. The items appeared to have been worn and were dirty.

After renewed searches of the entire facility, it was determined items totaling $180.29, largely the intimate items from Walmart, remained unaccounted for. Of the remaining purchases made by R.S., items totaling $110.89 were deemed by staff to be appropriate for T.F.'s use. Items totaling $614.83 were deemed inappropriate for T.F. and returned to the stores.

The facility's director filed an incident report and initiated an internal audit. R.S. was terminated and T.F.'s account was reimbursed $180.29 for the missing items. A police report was made to the Hanover Township Police Department and staff later provided documentary evidence in the form of the

4

receipts and inventory lists of the items. A summons was ultimately issued, and R.S. was charged with theft. He later received a conditional dismissal of the charge.

Colleen Schanstine from the DHS Office of Investigations initiated an investigation. She visited the group home, viewed T.F.'s room, and met T.F. who, based on her disabilities, could not be interviewed. Investigator Schanstine also spoke with multiple individuals, including R.S. R.S. informed her that on March 4, he had returned because he forgot his "lunch". Investigator Schanstine also reviewed several documents, including petitioner's employment and training records, police reports, the facility's financial records, incident reports, and itemized inventory lists. She concluded as to the incident of Financial Exploitation of over $100, a preponderance of the testimonial and documentary evidence substantiated a finding petitioner had exploited T.F. The Office of Investigations issued a six-page summary of Investigator Schanstine's findings. The report reiterated the investigator's observations and the testimonial and documentary evidence substantiating the alleged exploitation of T.F. by petitioner.

The Director notified R.S. of the agency's intent to place him on the Central Registry and his right to appeal. Petitioner requested a formal Office of

Administrative Law ("OAL") hearing, and the matter was transferred to the OAL as a contested case.

At the OAL hearing, the agency called Investigator Schanstine as its only witness. Investigator Schanstine testified to her eleven-year experience as an investigator with the Office of Program Integrity and Accountability and the processes to initiate an investigation. When Investigator Schanstine was asked about the incident report logged by the facility, petitioner's counsel objected because it contained statements by an individual not present at the hearing. The ALJ noted the objection but stated, "[M]any of these documents are full of hearsay. . . . [W]e survive here in the OAL on the residuum rule and I'm going to allow . . . it to be testified to."

Investigator Schanstine testified to researching limitations on T.F.'s ability to communicate by reviewing her individualized service plan and identifying her legal guardians for notification. She testified to interviewing the facility's employees, obtaining documents, contacting the police, and reviewing the receipts, ledgers of T.F.'s account, and documentation of what items were found in the home and what remained missing.

Investigator Schanstine then testified as to her interviews with the facility's staff, their discovery of the items not appropriate for T.F., and their

alerting their manager to the situation. She also testified to interviewing the manager who was called in to audit the purchases and the receipts. She then testified to interviewing the staff member who observed petitioner returning to the facility after hours, under the premise he had forgotten his lunch there, and some of the missing items being discovered later that same evening, after petitioner departed, and the following morning. Investigator Schanstine also testified to her contact with the police and her research into the disposition of petitioner's criminal matter. Petitioner objected to the introduction of the police report, but stipulated to the fact the incident was reported to police as required by statute.

Investigator Schanstine then testified to the receipts and lists of items deemed inappropriate for T.F., which included some items which, given T.F.'s disabilities, she would not be able to put on herself. She also noted the receipts had been initialed by petitioner per agency protocol, and when interviewed, petitioner had said he made the purchases "on his own at whatever time as some of the purchase[s] were made late at night. And on days that he wasn't working." She testified per the receipts and inventory lists, $180.29 worth of items remained unaccounted for.

A-2344-22

On cross-examination, Investigator Schanstine testified she did not personally create the underlying documents on which her investigation relied: the inventory lists of the items purchased, the purchase receipts, and the return receipts. However, she did compare them, and they appeared to be accurate.

The ALJ then questioned Investigator Schanstine as to T.F.'s sizes, her physical stature, and the nature of the undergarments purchased. She also testified T.F. was unable to communicate verbally in order to participate in an interview due to the extent of her disabilities.

The petitioner presented two witnesses, co-workers from a second job petitioner held at St. Clare's hospital in Denville. Both witnesses testified petitioner arrived at St. Clare's at approximately 5:00 p.m. or 5:30 p.m. on March 4, 2020, and to the best of their knowledge, did not leave for the duration of his shift.

The ALJ issued his decision on February 3, 2023. After summarizing Investigator Schanstine's professional experience, her investigatory methods, and the facts of the case as recounted in her report, the ALJ found petitioner worked as a caregiver at the facility and T.F. was a service recipient under the Division of Developmental Disabilities. He further found "while on duty, and

as part of his job, [petitioner] bought items with T.F.'s money in excess of $100." The ALJ did not specifically comment on the credibility of any of the witnesses.

When applying the law to these facts, the ALJ concluded the agency's case in chief "offered no direct testimony from any witness nor any evidence to the events of March 9, 2020." He stated, "there was no residuum of legal and competent evidence to sustain" the allegations in the case. However, he then stated "the unfortunate result is that T.F. was taken advantage of and exploited without any repercussions to the offender." He ended by holding the agency erroneously determined petitioner exploited T.F. and ordered petitioner's placement on the registry reversed.

DHS filed exceptions to the initial decision, arguing the ALJ incorrectly applied the residuum rule. It argued the facts of the case, supported by the physical presence of the missing items discovered after petitioner's off-hours visit to T.F.'s room, as well as the receipts and inventory lists, substantiated the hearsay evidence in Schanstine's report. It also noted petitioner had the opportunity to subpoena those interviewed in the course of the investigation but did not, and his attorney cross-examined Schanstine at the hearing before the ALJ. It also emphasized petitioner called two witnesses on his own behalf,

undercutting his argument the State violated his due process rights. The agency also noted the ALJ's decision did not include any credibility findings.

The Director issued a final agency decision on March 17, 2023. She stated the ALJ's Initial Decision was flawed and incorrect by finding no evidence of the exploitation, because the documentary evidence accompanying Investigator Schanstine's report, including receipts not subject to exclusion by the hearsay rule, were entered into evidence at the hearing as joint exhibits. The Director conceded Schanstine's report contained hearsay but determined the hearsay statements were minimally relevant and "strongly buttressed by legally competent evidence."

Accordingly, the Director rejected and reversed the ALJ's findings and conclusions. She noted the ALJ declined to assess the witnesses' credibility, did not cite to any specific instance of hearsay as objectionable, and ignored the physical, documentary evidence submitted at the hearing. She affirmed the agency's initial determination petitioner committed an act of exploitation as defined in N.J.A.C. 10:44D-1.2[3] and placed him on the Central Registry.

---

[3] "Exploitation" means the act or process of a caregiver using an individual with a developmental disability or his resources for another person's profit or advantage.

This appeal followed, wherein petitioner contends the final agency decision should be reversed because it relies solely on hearsay uncorroborated by a residuum of competent evidence.

II.

Our review of a final decision of an administrative agency is limited. Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 9 (2009). "[A]n appellate court reviews agency decisions under an arbitrary and capricious standard." Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019). See also Melnyk v. Bd. of Educ. of the Delsea Reg'l High Sch. Dist., 241 N.J. 31, 40 (2020). "An agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

A reviewing court is not, however, bound by an agency's interpretation of a statute or its determination of a strictly legal issue outside its charge. Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 158 (2018); Dep't of Child. & Fam. v. T.B., 207 N.J. 294, 302 (2011). See also Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992) (agencies have no superior

ability to resolve purely legal questions, and a court is not bound by an agency's determination of a legal issue).

III.

Petitioner argues administrative decisions may not be based on hearsay alone but instead require a residuum of legal and competent evidence. Petitioner also argues "the identity of those whose adverse views formed the foundation of the judgment against [petitioner] did not come to court." Citing Weston v. State, 60 N.J. 36, 51-52 (1972), he claims he was not given the opportunity to make a record, and the agency's failure to call witnesses with personal knowledge of the events meant it failed to carry its burden of proof.

The Administrative Procedure Act ("APA") governs contested cases before an ALJ. N.J.S.A. 52:14B-1 to -31. The APA requires findings of fact to be based "exclusively on the evidence and on matters officially noticed." N.J.S.A. 52:14B-9(f). In a contested case in the OAL, the parties "shall not be bound by rules of evidence[,] whether statutory, common law, or adopted formally by the Rules of Court. All relevant evidence is admissible, except as otherwise provided[.]" N.J.S.A. 52:14B-10(a)(1).

The Uniform Administrative Procedure Rules also govern evidentiary matters in contested cases. N.J.A.C. 1:1-15.1 to -15.12. They permit

12

discretionary exclusion under an N.J.R.E. 403-like analysis but mandate application of privilege rules. N.J.A.C. 1:1-15.1(c); N.J.A.C. 1:1-15.4. Subject to exclusion on either of those grounds, the regulations state "hearsay evidence shall be admissible in the trial of contested cases." N.J.A.C. 1:1-15.5(a) (emphasis added). The weight accorded to the admitted hearsay evidence is subject to the judicial determination of "the nature, character[,] and scope of the evidence, the circumstances of its creation and production, and, generally, its reliability." Ibid. The regulation continues, "[n]otwithstanding the admissibility of hearsay evidence, some legally competent evidence must exist to support each ultimate finding of fact to an extent sufficient to provide assurances of reliability and to avoid the fact or appearance of arbitrariness." N.J.A.C. 1:1-15.5(b).

This provision, commonly known as the "residuum rule," means hearsay may be "employed to corroborate competent proof, or competent proof may be supported or given added probative force by hearsay testimony." DeBartolomeis v. Bd. of Rev., 341 N.J. Super. 80, 85 (2001) (quoting Weston, 60 N.J. at 51). By the regulation's plain language, such corroboration goes not to the admissibility of the hearsay evidence, which is required, but rather to its weight as assessed by its reliability.

The residuum rule was applied to uphold the termination of a public employee charged with unbecoming conduct in In re Tenure Hearing of Cowan, 224 N.J. Super. 737, 742 (App. Div. 1988). One of the charges was supported by "the testimony of the [employee's supervisor], his contemporaneous memorandum that he had sent to [petitioner] recounting facts learned from alleged eyewitnesses, and [petitioner's] memorandum in response." Id. at 748. The supervisor had not witnessed the incident, and Cowan contended the evidence against him was inadmissible hearsay. Id. at 749. We agreed it was hearsay but concluded the "application of the residuum rule does not require that hearsay evidence of the assault be ignored." Id. at 750.

Investigator Schanstine testified to her direct observations of T.F. and her room during her in-person visit to the home. Additionally, she testified that R.S. gave a statement to her where he admitted to buying the clothing, suggesting they had been worn, and returning to the residence on March 4 after his shift was over when he claims to have forgotten his lunch. To the extent his statements were hearsay in that they were offered for their truth, they would have qualified for an exception to the general exclusionary rule as statements by a party opponent. N.J.R.E. 803(b)(1).

Further, it is clear the ALJ did not properly consider the additional competent evidence before him as supportive of the hearsay statements contained in Investigator Schanstine's report and testimony, such as the receipts, articles of clothing, agency's financial records, the inventory lists compiled after the searches of the facility, and the missing items. See N.J.R.E 803(c)(6) (the business records hearsay exception) and N.J.R.E. 803(c)(8) (the public records hearsay exception). These were all legally competent evidence entered as joint exhibits, supporting the hearsay statements contained inside the investigator's report and as relayed in her testimony. Despite petitioner's contention, Weston makes clear the residuum rule is bi-directional; the hearsay can support the weight of other legally competent evidence, or the other evidence can support the weight of the hearsay statements. 60 N.J. at 51. No matter which way the hearsay statements in the report are employed, much like the evidence in Cowan, their "combined probative force" substantiated the finding of exploitation. The "bootstrapping and buttressing" to which petitioner has objected to in his brief is precisely what the residuum rule permits.

IV.

An agency may reject and modify an ALJ's initial decision, as was done here, but its authority to do so is limited. Specifically, the Administrative Code

15

requires that when an agency rejects an ALJ's decision, it shall clearly state the reasons for doing so and cite specific evidence supporting its final decision and interpretation of the law. N.J.A.C. 1:1-18.6-10(b). An agency may only reject or modify findings of fact as to issues of credibility of lay witness testimony if it first determines on a review of a record that the findings are arbitrary, capricious, or unreasonable, or are not supported by sufficient, competent, and credible evidence. N.J.A.C. 1:1-18.6-10(c).

Here, the ALJ declined to make any credibility findings as to the testimonial evidence presented and then made conclusory generalizations. The agency's reasons overturning these errors were clearly and logically outlined in the comprehensive final determination recounting the initial decision, the exceptions filed, and a detailed discussion leading to the final determination. The agency specifically connected the contentions in the report to the supporting documentary evidence.

The agency then issued its findings of fact and concluded petitioner committed exploitation and therefore placement of his name on the Central Registry was warranted. Support for these findings include documentary evidence, in the form of physical receipts from the vendors, of not only what was purchased, but also what was returned, clearly showing that the items were

A-2344-22

wholly inappropriate and unsuitable for T.F. and that R.S. actually purchased these items for someone else. The agency permissibly amplified the factual findings and supported them with the same documentary evidence submitted at the evidentiary hearing. It also supported its conclusion petitioner committed exploitation as defined in N.J.A.C. 10:44D-1.2, and his placement on the Central Registry was proper under N.J.A.C. 1:1-18.6(d).

We have considered all other points raised and conclude they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(D) and (E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17                                                                    A-2344-22